UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,

v.

CALVIN EARL McREYNOLDS, JR.,

        Defendant.
_____/

Case No. 1:16-CR-20677-15

Honorable Thomas L. Ludington
Magistrate Judge Patricia T. Morris

**OPINION AND ORDER ATTRIBUTING PRESENTENCE REPORT DRUG QUANTITY TO DEFENDANT FOR PURPOSES OF CALCULATING DEFENDANT'S BASE OFFENSE LEVEL UNDER USSG § 2D1.1**

This case is on remand from the United States Court of Appeals for the Sixth Circuit. On October 6, 2017, a jury convicted Defendant Calvin Earl McReynolds, Jr. of one count of conspiracy to distribute and to possess with intent to distribute a controlled substance, in violation of 21 U.S.C. §§ 841(a)(1) and 846. ECF No. 478. At sentencing, this Court, relying on *United States v. White*, 551 F.3d 381 (6th Cir. 2008) (en banc), agreed with the rationale of the Probation Officer and attributed the Presentence Investigation Report ("PSR") drug quantities to Defendant, applying a preponderance of the evidence standard of proof, even though the jury had attributed a lesser quantity. ECF No. 572.

On appeal, the Sixth Circuit affirmed Defendant's conviction but vacated his sentence and remanded the case for resentencing "with instructions that the district court adequately explain its attribution of any drug amounts to McReynolds if the district court deviates from the jury's verdict when calculating McReynolds' base offense level." ECF No. 713 at PageID.5412. For reasons explained below, the PSR drug quantity will be attributed to Defendant for purposes of calculating his base offense level under USSG § 2D1.1 for resentencing.

I.

A.

In June 2015, federal authorities began investigating a drug trafficking conspiracy operated by the "Sunnyside Gang" in the southside of Saginaw, Michigan.[1] The investigation would ultimately include the Federal Bureau of Investigation, the Drug Enforcement Agency, the Michigan State Police, and the Saginaw and Bay City Police Departments. The conspiracy was believed to have been responsible for distributing substantial quantities of cocaine and heroin, often laced with fentanyl, primarily acquired from sources in Detroit, Michigan and distributed in Saginaw, Lansing, and Grand Rapids. As part of their investigation, police performed roughly 50 controlled buys and obtained an extended Title III wiretap for the phone of Damarlin Beavers, the leader of the conspiracy, and Derek Riley, his supplier, which allowed police to monitor the conversations of Beavers, Riley, and others.

Through the Title III application process, this author reviewed transcripts of the conversations of conspirators, which established probable cause that Beavers was involved in a substantial drug trafficking conspiracy and that a wiretap was necessary to the investigation. *See* 18 U.S.C. § 2518 (providing procedure for judicial authorization of wiretap). The initial Title III wiretap for Beavers was approved on June 14, 2016 and continued for 30 days. The wiretap was reauthorized for another 30 days on July 21, 2016. In total, police intercepted 2,279 pertinent calls over the 60-day wiretap period. The information that was collected was furnished to the defendants during discovery and, in fact, became the subject of a motion to suppress that challenged the necessity for the wiretap, considering the other evidence available to the Government. *See* ECF No. 303.

---

[1] These facts are derived from the Presentence Investigation Report.

The intercepted calls depicted a sophisticated criminal enterprise with a decided division of labor. As leader of the conspiracy, Beavers would purchase kilograms of heroin and cocaine primarily from his supplier, Derek Riley. The kilograms would then be broken down, "cut" (diluted) and packaged for retail distribution. At the lowest level of the conspiracy, street dealers like Brandon Pratt would sell the drugs to their "customers" primarily in the southside of Saginaw.

On August 30, 2016, police executed search warrants at several residences in Saginaw, including 3253 Grant Street, which they believed to be one of the "stash houses" used by the conspiracy. At the Grant Street stash house, police recovered 47.59 grams of heroin, 12 firearms, four cell phones, three digital scales, and related paraphernalia. In total, police recovered 711.56 grams of powder cocaine, 127.91 grams of cocaine base, and 632.06 grams of heroin from the searches they performed.

The sworn complaints initiating these proceedings were filed in August 2016. On April 12, 2017, Defendant was charged with conspiracy to distribute and to possess with intent to distribute heroin and cocaine "[f]rom a date unknown to the Grand Jury, but since at least June 15, 2015, to on or about August 30, 2016"—that is, a little over 14 months—as part of a 30-count indictment. ECF No. 183. Ultimately, 18 defendants would be charged as conspirators. Seventeen defendants pled guilty. Defendant, however, proceeded to trial on October 3, 2017. This Court sentenced all of the conspirators after considering the Presentence Investigation Reports, each conspirator's allocution, and remarks from the Government at sentencing.

B.

At trial, the jury heard testimony from three principal witnesses.[2] The jury first heard from FBI Special Agent Mitchell King. Special Agent King coordinated the joint task force of federal

---

[2] Defendant did not present any evidence.

and state authorities that investigated Beaver and his network. ECF No. 570 at PageID.3827. Special Agent King was able to identify the voices of Defendant, Beavers, and other members of the conspiracy in intercepted phone conversations played for the jury. *Id.* at PageID.3853. Based on these and other intercepted calls,[3] Special Agent King testified that Defendant was an active member of the conspiracy who, in addition to purchasing a half ounce of cocaine from Beavers about every four days, *id.* at PageID.3878, shared weight scales with Beavers, *id.* at PageID.3884. Special Agent King also testified that a remote pole camera identified Defendant at the Grant Street stash house along with other conspirators. *Id.* at PageID.3903–04.

The jury next heard from Brandon Pratt, a co-conspirator and longtime friend of Defendant. Pratt had known Beavers, Defendant, and other co-conspirators "all [his] life," as many of them grew up together on the southside of Saginaw. ECF No. 571 at PageID.3965–69. Pratt's sister and Defendant's sister were best friends, *id.* at PageID.3983, and Pratt was the godfather of Defendant's son, *id.* at PageID.3991. Pratt and Defendant learned to "cook" crack cocaine together in Defendant's mother's kitchen. *Id.* at PageID.3984–85. Pratt characterized Defendant, Beavers, and other conspirators as lifelong drug dealers. *Id.* at PageID.3965–69.

Pratt testified that after Beavers got out of prison in 2013, he became the "hook up for everybody." *Id.* at PageID.3978. Around that same time, Pratt and Defendant began to socialize less frequently than they had in the past, *id.* at PageID.3979, though the two remained friends and saw each other "once or twice a week," *id.* at PageID.3994, 4020. Indeed, during Pratt's direct examination, the Government introduced a Facebook photo of Pratt, Defendant, and co-conspirator Kendrell Stephens that had been posted in December 2015. *Id.* at PageID.4019–20.

---

[3] In addition to wiretapping Beavers, the FBI also intercepted jail calls. ECF No. 570 at PageID.3581, 3590.

Like Special Agent King, Pratt was able to identify the voices of Defendant, Beavers, and other conspirators in intercepted phone calls. From these calls—and from his independent knowledge of the conspiracy—Pratt implicated Defendant in various joint undertakings, including setting drug prices to divert business from other dealers, *id.* at PageID.4000–02, obtaining Inositol to "cut" (dilute) the drugs, *id.* at PageID.4005, and sharing scales, *id.* at PageID.4012–13. Pratt also confirmed that other members of the conspiracy would call Defendant to warn him when police were nearby. *Id.* at PageID.4006–09

Pratt further testified that Defendant frequently associated with other conspirators, including Kendrell Stephens, who was generally in charge of "cutting" the group's heroin for distribution. *Id.* at PageID.3997–98. According to Pratt, Defendant and Stephens often sold drugs together and would even share customers. *Id.* at PageID.3996–98. With respect to the Grant Street stash house, Pratt did not know whether Defendant ever used the house to store drugs but testified that he had seen him there "once or twice." *Id.* at PageID.4014, 4017.

Araceli Acosta, a recovering drug addict and one of Defendant's customers, also testified. Acosta testified that between 2014 and August 2016, she bought heroin and crack cocaine from Defendant "two or three times a day," generally totaling 0.3 grams of each per day. ECF No. 559 at PageID.3503–05. She also testified that Defendant and Kendrell Stephens (often referred to as "Smurf"), whom she also bought from, "were always together"—so much so that Acosta thought the two were brothers.[4] *Id.* at PageID.3511–12. Acosta further stated that Defendant regularly carried a gun. *Id.* at PageID.3508.

Acosta also testified that she had seen Defendant, Stephens, and other conspirators together at an apartment known as "the kitchen." *Id.* at PageID.3512. As Acosta recalled, she came to "the

---

[4] In fact, Acosta explained that she referred to Defendant as "Lil' Bro" because she knew Kendrell Stephens as "Bro." ECF No. 559 at PageID.3511.

- 5 -

kitchen" looking to buy heroin from Defendant. *Id.* It is unclear whether Defendant was already there when she arrived, but Acosta waited at the apartment for some time until Stephens walked in carrying "bricks" of cocaine and heroin in a duffel bag. *Id.* at PageID.3513. Stephens then apparently said, "Remember, she's not supposed to be here." *Id.* Acosta left the room to wait outside. *Id.* at PageID.3516. She testified that she waited for approximately 15 minutes until Defendant stepped out and sold her the heroin she wanted. *Id.*

Michigan State Police Lieutenant Matthew Rice testified that kilograms of cocaine and heroin are often packaged and compressed in the shape of a "masonry brick." *Id.* at PageID.3567–68. He further testified that kilograms of cocaine and heroin are commonly referred to as "bricks" or "cakes." *Id.* at PageID.3568. The Government later estimated in its objection to the PSR that the bricks seen by Acosta totaled approximately five kilograms of cocaine and five kilograms of heroin, for a total marijuana equivalency of 6000 kilograms.

Acosta also recalled another instance where she met Defendant at the kitchen. She testified that Defendant was there with Stephens and that the two were packaging heroin for retail distribution using Keno paper. *Id.* at PageID.3517–18.

### C.

On the morning of Friday, October 6, 2017, the Government rested its case, and the jury heard closing arguments and instructions. For reasons discussed in Section II., *infra*, the jury was asked to determine the type and amount of controlled substances "that was either attributable to the defendant as a result of his own conduct, or the conduct of other conspirators reasonably foreseeable to him." ECF No. 478 at PageID.2534. The jury began deliberations at 10:43 A.M.

At 2:07 P.M., the jury submitted two requests in writing, "Can we please get the reports showing the amount of controlled substances from all the house seizures," and, "We would just

like the grams of what's seized [sic] from the houses, the Michigan State Police report." ECF No. 560 at PageID.3659. This Court, pursuant to the parties' joint stipulation, instructed the jury that the relevant evidence could be found in Exhibits 85 and 86. *Id.* at PageID.3659–60. Exhibits 85 and 86 were Michigan State Police lab reports, admitted by joint stipulation of the parties, documenting the quantity of drugs recovered from the search warrants executed in the case. *Id.* at PageID.3659–61.

At around 2:55 P.M., the parties informed this Court of a problem: stipulated Exhibit 85 included drugs that were recovered from searches unrelated to the case. *Id.* at PageID.3660–61. After some discussion regarding how to proceed, the jury was brought back into the courtroom to hear further testimony from Special Agent King *Id.* at PageID.3660–71. Special Agent King confirmed that Exhibit 85 included drugs recovered from three searches unrelated to the case and then explained that Exhibit 85A—a redacted version of Exhibit 85 that the Government had quickly prepared—contained only the relevant quantities. *Id.* at PageID.3671. Exhibit 85A (which provided a lesser quantity than the initial stipulation) was thus admitted into evidence over the (unexplained) objection of defense counsel, who was offered the opportunity to cross-examine Special Agent King. *Id.*

After Special Agent King testified, this Court addressed another note from the jury, which asked for "clarification on Mr. McReynolds' responsibility for drugs he sold or all the drugs seized in the conspiracy [sic]." *Id.* at PageID.3672. The jury was advised to reexamine the instructions concerning the definition of conspiracy and the later instructions determining the amount of controlled substances attributable to Defendant. *Id.*; *see also* ECF No. 480 at PageID.2251–53, 2255 (relevant jury instructions). The jury reconvened at 3:17 P.M. ECF No. 560 at PageID.3673.

At 3:34 in the afternoon of a long week, the jury returned a guilty verdict with the lowest finding of drug quantity available: less than 100 grams of heroin and less than 500 grams of cocaine. *Id.* at PageID.3674.

### D.

The Probation Officer completed the PSR in October 2017. The Report reflected that Defendant was 29 years of age, that he "ha[d] three children from three different relationships," that he "ha[d] no documented employment history," and that he had "received his General Equivalency Degree (GED) on July 7, 2007, while incarcerated with the Michigan Department of Corrections." Defendant scored six criminal history points with two convictions for delivery of less than 50 grams of cocaine in 2006 and 2016, convictions for possession of a firearm by a felon and felony firearm, habitual offender second, in 2007, and a conviction for malicious destruction of police property with a value over $200 but less than $1,000 in 2012.

The Probation Officer concluded in the PSR that the drug quantity attributable to Defendant—that is, reasonably foreseeable to him and within the scope of his agreement—was 711.56 grams of powder cocaine, 263.51 grams of cocaine base, and 767.66 grams of heroin, for a total marijuana equivalency of 1850.97 kilograms. This amount included the quantities seized by police during their investigation from the search warrants executed in Saginaw (711.56 grams of powder cocaine, 127.91 grams of cocaine base, and 632.06 grams of heroin) as well as the quantities sold to Acosta (135.6 grams of cocaine base and heroin). The Probation Officer did not include the quantities that Defendant sold to Acosta before June 5, 2016—even though she testified that Defendant began selling to her in January 2015—to accord with the conspiracy period in the indictment (*i.e.*, "[f]rom a date unknown to the Grand Jury, but since at least June 15, 2015, to on or about August 30, 2016"). This amount also did not include the "bricks" observed by Acosta at

the kitchen—which the Government estimated to consist of five kilograms of cocaine and five kilograms of heroin—because, according to the Probation Officer, Acosta's testimony could not reliably establish the weight and composition of the bricks. Both parties objected to the PSR. The Government objected to the exclusion of the bricks, and Defendant objected to the attribution of drug quantities greater than the jury's verdict.

At sentencing, Defendant raised his objection to the drug quantities in the PSR. He did not wish to call any witnesses nor testify during the hearing. His attorney asked this Court to sentence him consistent with the jury's drug quantity attribution. ECF No. 572 at PageID.4098–99. The parties had previously submitted sentencing memorandums and supplemental briefing discussing the evidence at trial and the propriety of deviating from the jury's determination. *See* ECF Nos. 523, 533, 536. Having reviewed the parties' briefing and the PSR, this Court overruled Defendant's objection and found that the PSR quantity should be attributed to Defendant because that quantity was within the scope of his conspiratorial agreement and foreseeable to him. ECF No. 572 at PageID.4099–101. Consistent with the PSR, this Court declined to attribute the "bricks" observed by Acosta. This Court found Acosta's testimony that Defendant was involved with dividing the bricks to be credible but found the evidence as to the composition and weight of the bricks to be conjecture. *Id.* at PageID.4100.

The PSR quantity left Defendant with a base offense level of 30. Given his base offense level, criminal history, and the two-level firearm enhancement, Defendant had a guideline range of 151 to 188 months. *Id.* at PageID.4106–07. Exercising its discretion under 18 U.S.C. § 3553, this Court sentenced Defendant to 151 months imprisonment and six years of supervised release. *Id.* at PageID.4120. Had the "bricks" seen by Acosta been attributed to Defendant—as the

Government believed it should—his guideline range would have been 188 to 235 months. *Id.* at PageID.4099.

**E.**

On appeal, the Sixth Circuit affirmed Defendant's conviction but remanded the case for resentencing.

As the court explained, "[f]or defendants convicted of drug crimes, the base offense level at sentencing depends upon the amount of drugs involved in the offense. This is because, under the advisory sentencing guidelines, a defendant's base offense level is derived from his or her 'relevant conduct,' as that term is defined in USSG § 1B1.3." *United States v. McReynolds*, 964 F.3d 555, 562 (6th Cir. 2020) (internal quotation marks and citations omitted). Furthermore, "in order to hold a defendant accountable for the acts of others [under § 1B1.3(a)(1)(B)], a district court must make two particularized findings: (1) that the acts were within the scope of the defendant's agreement; and (2) that they were foreseeable to the defendant." *Id.* at 563 (quoting *United States v. Campbell*, 279 F.3d 392, 399 (6th Cir. 2002)).

The Court of Appeals held that under *White*, this Court could "deviate from jury-found facts and [] sentence [Defendant] based on judge-found facts" only if those "judge-found facts" were "supported by a preponderance of reliable evidence." *Id.* at 565. According to the court, the transcript at sentencing was inadequate to determine whether this Court had complied with *White*. *Id.* at 566. Moreover, the court expressed some skepticism that Defendant could be liable for the PSR drug quantity, given the lack of physical evidence connecting him to the drugs recovered from the Grant Street stash house and elsewhere. *Id.* at 565.

The case was remanded "with instructions that the district court adequately explain its attribution of any drug amounts to McReynolds if the district court deviates from the jury's verdict when calculating McReynolds' base offense level." *Id.* at 570.

Since the case was remanded, this Court and counsel have participated in several telephonic conferences to discuss the Sixth Circuit's Opinion, the events at trial, and the status of resentencing. In preparation for resentencing, counsel filed supplemental briefs analyzing the controlling authority and the evidence at issue. *See* ECF Nos. 739, 740, 743, 744. Counsel also filed a joint stipulation agreeing, *inter alia,* that (1) the PSR drug quantities result in a base offense level of 30 and that (2) neither party seeks to supplement the record with additional evidence regarding the controlled substance amounts at issue.[5] ECF No. 769.

## II.

Among Defendant's principal arguments on remand is that *White* was wrongly decided and that the jury's attribution should be binding. *See* ECF No. 740 at PageID.5846–54. He previously made similar arguments before the Sixth Circuit on appeal. *McReynolds*, 964 F.3d at 566–67. Defendant's position undoubtedly contemplates a sentencing regime quite different from that envisioned by Congress or preserved by the Supreme Court.

The United States Sentencing Guidelines (the "Guidelines") are a product of the Sentencing Reform Act of 1984, 98 Stat. 1987. When the Sentencing Act was enacted, "Congress' basic statutory goal" was "a system that diminishes sentencing disparity"—a system wherein judges would "determine, and [] base punishment upon, the real conduct that underlies the crime of conviction." *Booker*, 543 U.S. at 250. To that end, the Guidelines require district courts to

---

[5] Defendant has, of course, expressly reserved the right to argue that the amounts attributed to him in the PSR were not properly attributed. ECF No. 769 at PageID.6031.

- 11 -

ascertain the "relevant conduct" underlying the defendant's offense, which is defined rather expansively in (1)(A) but more narrowly in (1)(B):

> (1)(A) all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant; and
>
> (B) in the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy), all acts and omissions of others that were—
>
>> (i) within the scope of the jointly undertaken criminal activity,
>>
>> (ii) in furtherance of that criminal activity, and
>>
>> (iii) reasonably foreseeable in connection with that criminal activity;
>>
>>> that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense;
>
> (2) solely with respect to offenses of a character for which § 3D1.2(d) would require grouping of multiple counts, all acts and omissions described in subdivisions (1)(A) and (1)(B) above that were part of the same course of conduct or common scheme or plan as the offense of conviction;
>
> (3) all harm that resulted from the acts and omissions specified in subsections (a)(1) and (a)(2) above, and all harm that was the object of such acts and omissions; and
>
> (4) any other information specified in the applicable guideline.

USSG § 1B1.3(a). While recent changes in Sixth Amendment jurisprudence have narrowed the outer limits of judicial factfinding, *see, e.g.*, *Apprendi v. New Jersey*, 530 U.S. 466 (2000); *Blakely v. Washington*, 542 U.S. 296 (2004), the Supreme Court has never rejected the basic "reform" principle that sentencing should be based on the "real conduct" of the defendant as found by the sentencing judge. Indeed, the Court in *Booker* severed §§ 3553(b)(1) and 3742(e)—thereby introducing the advisory guideline era—to "preserve the important elements" of the "judge-based sentencing system" created by Congress. *Booker*, 543 U.S. at 265. As a result, sentencing courts remain compelled to "consider Guidelines ranges" when fashioning a sentence. *Id.* at 245.

In effect, Defendant would not only have this Court disregard the Sixth Circuit's decision in *White*, he would have it abandon the role that district courts were directed to undertake in the post-*Booker* world. As explained in *White*, Defendant's position is no longer tenable.

> [T]he relevant statutory ceiling is no longer the Guidelines range but the maximum penalty authorized by the United States Code . . . So long as the defendant receives a sentence at or below the statutory ceiling set by the jury's verdict, the district court does not abridge the defendant's right to a jury trial by looking to other facts, including acquitted conduct, when selecting a sentence within that statutory range.
>
> Neither White nor the dissent offers any explanation why sentences based on acquitted conduct differ for Sixth Amendment purposes from any other sentence driven by judge-found facts but falling within the statutorily defined sentencing range. And they offer no explanation why that claim makes sense post-*Booker*. By freeing a district court to impose a non-guidelines sentence, *Booker* pulled out the thread that holds White's Sixth Amendment claim together.

*White*, 551 F.3d at 384–85 (internal citations omitted). While acquitted conduct is not always an appropriate basis for enhancing a sentence—as *White* recognized[6]—doing so here was supported by the weight of the evidence and by this Court's duty to resolve objections to the PSR through judicial factfinding, as discussed *infra*.

### III.

### A.

Turning to this Court's principal task on remand, the record shows by a preponderance of the evidence that (1) the acts of Defendant's co-conspirators were "within the scope of [his] agreement," and (2) that the same acts were "foreseeable to [him]." *McReynolds*, 964 F.3d at 563.

The evidence at trial demonstrated that Defendant, as an active member of the conspiracy, would help set drug prices, share scales, and obtain substances to "cut" the drugs. *Cf. United States*

---

[6] As the Sixth Circuit explained, "a factual presentation that fails to persuade a jury beyond a reasonable doubt may well fail to persuade a judge by a preponderance of the evidence." *White*, 551 F.3d at 386. Additionally, the guideline range produced by the consideration of acquitted conduct might, in some circumstances, exceed an appropriate sentence for purposes of 18 U.S.C. § 3553. *Id.* at 386. Importantly, however, judge-found facts can also mitigate a defendant's sentence.

*v. Love*, 392 F. App'x 410, 417–18 (6th Cir. 2010) ("Love did not merely purchase cocaine from other members of the conspiracy for distribution, but he also recruited others and provided logistical support; his criminal responsibility therefore extended well beyond the quantities of cocaine that he himself handled."). The evidence at trial also indicated that Defendant collaborated with Kendrell Stephens, sold and packaged drugs in the "the kitchen," visited the Grant Street stash house with other conspirators, and was otherwise informed of and participated in the full scope of the criminal enterprise. There was even testimony that other conspirators would warn Defendant when police were patrolling near where he dealt drugs.

In his supplemental briefing, Defendant argues that he was just a low-level dealer who purchased heroin and cocaine from Beavers, and that his co-conspirators were simply friends that happened to sell drugs in the same neighborhood. *See* ECF No. 740 at PageID.5864. Defendant's characterization of the evidence ultimately depends on factual inferences that seem plausible only when purposefully considered in isolation. For example, Defendant contends that a phone call where Beavers asked, "Hey, you got a [scale]?", and Defendant answered, "Yeah," is not "proof" that the two shared scales. ECF No. 743 at PageID.5892. Perhaps—but given Pratt's testimony that the conspiracy shared scales, and other evidence of Defendant's involvement in the conspiracy, Defendant's argument requires a level of skepticism that need not be indulged at sentencing.[7]

---

[7] Elsewhere in the briefing, Defendant seems to misconstrue the evidence at trial. Regarding testimony that he collaborated with other conspirators to sell drugs, Defendant argues, "[Testimony that] multiple people were selling drugs in customer-rich locations . . . is not proof that Defendant and anyone else [were] working together." ECF No. 743 at PageID.5981. Pratt, however, specifically testified that Defendant would "catch sales" for co-conspirators Kendrell Stephens, Eugene Smith, and Michael Pratt. ECF No. 571 at PageID.3997–98.

Viewing the record as a whole, Defendant was not some independent dealer swept up in the indictment,[8] but a reliable collaborator who helped the conspiracy cut, price, and distribute large quantities of cocaine and heroin—the kind of dealer who, according to the Guideline Commentary, should be accountable for the drugs within the conspiracy. *See* USSG § 1B1.3 comment. (n.4) ("[S]treet-level drug dealer[] [who] pools his resources and profits with four other street-level drug dealers . . . is accountable under subsection (a)(1)(B) for the quantities of drugs sold by the four other dealers during the course of his joint undertaking.").

B.

In addition to the evidence presented at trial, the PSR attribution was supported by other sources of information.

As mentioned in Section I.A., *supra*, this Court statutorily oversaw the Title III wiretaps that allowed police to intercept over 2,000 pertinent calls from Damarlin Beavers' phone. As part of the Title III application process, this Court reviewed extensive transcripts involving Beavers, Defendant, and other co-conspirators, among other evidence establishing the scope of the conspiracy and the quantities trafficked therein. From these Title III materials, the conspirator conversations confirmed that the amount of drugs trafficked during the 14-months of the conspiracy greatly exceeded the "snap-shot inventory" of drugs that the police managed to recover in executing the search warrants.

C.

As earlier noted, 17 of the 18 conspirators entered guilty pleas. Importantly, for sentencing purposes, all 17 of Defendant's co-conspirators pled guilty and stipulated to at least 711.65 grams

---

[8] As the Sixth Circuit recognized on appeal, the purpose of the two-prong inquiry here is to "protect[] against the possibility that a less culpable, 'small-time' seller of drugs will be caught up in the sweep of [21 U.S.C. § 841] due to the acts of coconspirators." *McReynolds*, 964 F.3d at 563 (quoting *United States v. Pruitt*, 156 F.3d 638, 645 (6th Cir. 1998)).

of powder cocaine, 127.91 grams of cocaine base, and 632.06 grams of heroin.[9] These quantities represent the drugs recovered by police while executing the August 2016 search warrants. Notably, Michael Alvin Pratt, and some five other co-conspirators whom the PSR had ranked lower in the conspiracy's hierarchy, agreed that such quantities were attributable to each of them "as a result of [their] own individual conduct and the conduct of other co-conspirators reasonably foreseeable to [them]." The stipulations in these plea agreements tell essentially the same story as the evidence at trial: that Defendant knew that his co-conspirators were trafficking substantial amounts of cocaine and heroin, and that the amounts of cocaine and heroin trafficked during the term of the conspiracy well-exceeded the inventory on the day of the searches.

**D.**

This Court has, as a general proposition, great respect for juries and their efforts to reach accurate and just results. Indeed, that respect is supported by over 25 years of overseeing cases decided by juries. This jury, however, had some problems, though not of their own making.

The prospect of asking the jury to make a defendant-specific and drug quantity-specific determinations was first raised by the Government just prior to the completion of the final jury instructions. As this Court confirmed in recent telephonic conferences with counsel, the Government was acting on internal guidance from the Department of Justice, motivated apparently in part by *Alleyne v. United States*, 570 U.S. 99 (2013). In *Alleyne*, the Supreme Court held that any fact increasing a mandatory minimum must be submitted to the jury, stating, "[a]ny fact that, by law, increases the penalty for a crime is an 'element' that must be submitted to the jury and found beyond a reasonable doubt." *Id.* at 103.

---

[9] Damarlin Beavers and Javon Malik Pratt pled guilty to higher quantities of heroin.

In light of *Alleyne*, the DOJ guidance recommended that the Government seek a drug-specific and defendant-specific quantity instruction in every circuit,[10] even though the Sixth Circuit had recently held that *Alleyne* required no such instruction.[11] *See United States v. Watson*, 620 F. App'x 493, 508–09 (6th Cir. 2015) (citing *United States v. Robinson*, 547 F.3d 632 (6th Cir. 2008)) (holding that district court did not err by instructing jury to find conspiracy-wide quantity), *cert. denied*, 137 S. Ct. 332 (2016).

Regardless, the Government's suggestion seemed reasonable, especially given this Court's experience with advisory jury findings in employment litigation and the fact that USSG § 1B1.3(a)(1)(B) would require this Court to make a similar assessment. Accordingly, the jury was tasked with finding the specific type and amount of controlled substances "that was either attributable to the defendant as a result of his own conduct, or the conduct of other conspirators reasonably foreseeable to him." ECF No. 478 at PageID.2534. Nonetheless, whether the conduct of any conspirators was "reasonably foreseeable" proved to be a problematic inquiry.

Initially, the jury received two-and-a-half pages of instructions related to the crime of conspiracy. They were instructed that "it is a crime for two or more persons to conspire, or agree, to commit a drug crime, even if they never actually achieve their goal." ECF No. 480 at PageID.2551. Indeed, they were instructed that Defendant need not know everything about the conspiracy, or who was involved, to be a conspirator. Further, they were instructed that Defendant need not know what type of controlled substances were involved. But then, in apparent conflict to those instructions, they were directed to determine the specific types and amounts of controlled

---

[10] This Court has been unable to obtain a copy of the DOJ guidance in question.

[11] The issue has garnered some controversy in recent years. As the current commentary to the Sixth Circuit pattern jury instruction provides, "The Sixth Circuit has been inconsistent in addressing whether mandatory minimum sentences for § 846 drug conspiracy offenses are determined by conspiracy-wide or defendant-specific drug quantities." *See* Sixth Circuit Criminal Pattern Jury Instruction 14.07B (collecting cases). The pattern verdict form now asks the jury to find a defendant-specific quantity. *Id.*

substances that were attributable to Defendant—that is, the amounts he "personally agreed, or encouraged, would be distributed" or that he could have "reasonably foreseen would be distributed." *Id.* at PageID.2555.

As the jury's questions demonstrated, the jury was confused, and probably quite reasonably so. Indeed, the guidelines for determining relevant conduct for "jointly undertaken conduct" exceed seven pages of instructions, commentary, and illustrations. The suggestion that submitting guideline questions to the jury along with instructions for finding a conspiracy would prove challenging is hardly novel. As Justice Breyer remarked in *Booker*,

> [T]he sentencing statutes, read to include the Court's Sixth Amendment requirement, would create a system far more complex than Congress could have intended . . . How could a judge expect a jury to work with the Guidelines' definitions of, say, "relevant conduct," which includes "all acts and omissions committed, aided abetted, counseled, commanded, induced, procured, or willfully caused by the defendant; and [in the case of a conspiracy] all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity."

*Booker*, 543 U.S. at 254–55 (quoting USSG §§ 1B1.3(a)(1)(A)–(B)) (alterations original). To further complicate matters, after the jury asked for clarification regarding the drugs seized by police, their attention was directed to Exhibit 85, which had been admitted into evidence by stipulation of the Government and defense counsel. Exhibit 85, however, included drug quantities unrelated to the instant case. Despite the explanation they received for the error, this misstep confused the jury, which had already been saddled with a task that not even a majority of this nation's highest jurists would have assigned to them.

Accordingly, this Court believed there was good reason to reconsider the jury's determination, to independently evaluate the evidence, and to decide whether the preponderance of the evidence supported the attribution provided in the PSR. Upon doing so, this Court found, and now reaffirms, that the preponderance of the evidence indicates that the quantity of drugs set

forth in the PSR should be attributed to Defendant for purposes of calculating his base offense level.

**IV.**

Accordingly, it is **ORDERED** that the drug quantity set forth in the PSR will be attributed to Defendant for purposes of calculating his base offense level under USSG § 2D1.1 for resentencing.

Dated: April 12, 2021                                        s/Thomas L. Ludington
THOMAS L. LUDINGTON
United States District Judge